All right, our final case for this morning is Martin v. Commissioner Saul Mr. Forbes If it pleases the court, my name is Randall Forbes. I represent the disability claimant in this action, at least at this point. It's a very long procedural history. I actually did the very first hearing and then referred it to Mr. Schall, who at the time was probably the best appellate attorney in Indiana. He took the case over at that point. Then Mr. Schall retired a few, oh, probably sometime late last year, and I took the case back over. So that's where we are. If I could have one minute to talk, I think I can bring more clarity to this. It seems like all morning we've been involved in the morass of Rescue Dakota and claim preclusion, issue preclusion, and we're going to go there again, but with a little different flavor. It occurred to me of all times last night as I was reading my reply brief that 405G gives the district court the ability to affirm, modify, or reverse a Social Security decision with or without remand. And what we're essentially saying is that in the very first district court decision, what they did was they modified the decision with remand. Because essentially, if you read the decision and understand what the district court did, the whole decision is okay, except that there was an omission of concentration, persistence, or pace limitations. But by the time the case moves from the, once it comes down from district court, it goes to the appeals counsel. Appeals counsel issues a new order, and the order usually is an additional remand order telling the ALJ what happened at district court and what they're supposed to do. I believe at that point, then, this essentially partial remand, or excuse me, essentially what the district court did, another way of saying it is that they partially vacated the decision. No, so I understand your position to be that what the district court did is it put its stamp of approval, I'll put it that way, on everything that the first ALJ had done except the concentration, persistence, and pace, said go back, take the rest as a given, whether it's exertional, whether it's something else, and now build concentration, persistence, and pace back in, and that your complaint is what happened instead is that the second ALJ thought that there was more room for variation, that he could take a fresh look at lots of things because the district court's opinion hadn't, in some checklist fashion, said, and this is okay, that's okay, that's okay, that's okay. It was a more generic statement. In your view, Mr. Forbes, on this law of the case question, does the answer depend upon the precise phrasing of the original district court judgment? No, I think district courts, as well as ALJs, sometimes they move too quickly, and so you don't always see an ordering paragraph. You have to read it contextually. Well, okay. Yeah, the problem I have, my research, aided by both briefs on this law of the case issue, shows, I would just say, a lot of confusion as applying that doctrine to Social Security disability cases. The Sixth Circuit might be much more receptive to your argument than ours might be, I don't know, but if I could back up to the facts a little bit. Sure. I know you've been doing a lot of Social Security work for many years. Have you seen any other case where the residual functional capacity went from sedentary, a limited range of sedentary work, to no physical restrictions? I don't recall that there's been such a case. I mean, I'm close to 1,500 of these by now, so you know, there's a lot. No physical restrictions would include construction work, heavy work, steel worker. Very heavy work, which I can't specifically tell you the poundage, but it's a hundred-some pounds, at least occasionally. It's two hours and 40 minutes a day, so I can't tell you exactly how much the claimant weighed, but she's somewhat thin. It's absurd in a way. But on the law of the case issue, there are plenty of times when an ALJ will say, look at some ambiguous evidence about earnings, and say, well, I don't know whether this amounts to substantial gainful activity or not, but I'll assume that it's shown that you don't have substantial gainful activity, so we'll go on to Steps 4 and 5. Ultimately, the claimant loses at Steps 4 or 5. If that case comes back on Steps 4 or 5, is it your view that an ALJ would always, never, or sometimes be prohibited from looking at that SGA issue again? If they look at the SGA issue again, it's probably because there is new evidence that came out of that time period under consideration, as opposed to evidence created after. As opposed to just looking more closely at an issue that didn't seem all that decisive the first time around. I suppose they could have made a mistake on the math. That situation would rarely happen. Well, but I mean, look, you seem to be arguing for a pretty strong form of the law of the these elements of a vacated decision continue in force, and I would think that, at least from my background, I would say, at best, sometimes, and maybe never. But I take it on this record, there's no new evidence that would show that she had a miraculous recovery, and now, instead of being limited to sedentary, she can live 50 pounds all day long. What I think the only additional evidence is that non-examining consultant opinion by Mr. Eskonen, which is not actually new treatment evidence, it's an additional expert. Yeah, Mr. Forbes, let me ask you this as a way of putting this into the dialogue that we're having here. One of the things that confused me a touch was, after your client lost the first time around in front of the ALJ, she filed a new application for Title II benefits, an altogether new one. That new application went in front of the second ALJ. One of the things the second— Not quite right. Okay. So, there was a first application that was denied, that was not appealed. Then she applied again, and it went in front of the first ALJ. Okay, but then she filed an application, maybe it's a third one, on February 19th of 2014. Yeah, that was back in the days when they could file a subsequent— That's after the first ALJ opinion. Yeah, I understand what happened. And the thing that is standing out to me about that is the ALJ notes, this is on page 528 of the record, the ALJ seems to note that that third, whatever the application number is, it does not allege a physical impairment. And so, what I was wondering about is, does this new ALJ with a new application, is the physical impairment kind of anew? Probably not. The key to that is— If not, why not? Usually that situation is taken care of in the appeals council remand order that follows the district court remand, and they take—and what they do is they consolidate the subsequent application with the application that is coming back down on remand from the district court. No, but why would—I understand. Okay. Even if that is practically right, why wouldn't Ms. Martin, in what she filed in February of 2014, especially given the first ALJ opinion, why wouldn't she reallege the severe physical impairment? Yeah. I don't know the answer to that. I might be able to— And what's the meaning when you look at Pearson's opinion, first paragraph, he's talking about these two petitions, and he says, this and the previous claim for Title II have been consolidated. Okay. So, is he saying that all claims raised either time or live? What—the consolidated is the—I'm out of time, but I'll keep talking if you want me to answer this. Yes, please. The consolidation of the opinions—or, excuse me, of the applications essentially means that the one that was extant is treated as the one that is being decided, and the subsequent one is almost as if it's not in existence. This case is confusing because this was in a time period where you could file a subsequent application right after the ALJ decision, whereas now we're in the era where you have to wait until after the Appeals Council denies. So— Can I just ask one follow-up question, Mr. Forrest? Yeah. If the old residual functional capacity were to apply to Ms. Martin here— Yes. At what point, at what age would the so-called grids have kicked in to render her disabled? As long as the RFC is sedentary or light and has an unskilled component in it, she grids at age 55, and she was age 57 at the alleged onset date and age 62 at the date last insured. And quite frankly, even though we have a fallback position that says that the RFC, as constructed under the CPP doctrines, is faulty, all that we need—all that claimant needs to win this case, if the RFC is light or sedentary, is a limitation that indicates unskilled. And the routine and simple work limitation put in by the second ALJ is sufficient for that. Okay. Thank you very much. Pleasure. I don't—I won't need to come back and talk to you if you want me to. Thank you. All right. Thank you, Mr. Forbes. Ms. Jeffrey. May it please the Court, my name is Kia Jeffrey, representing the Commissioner of Social Security. Turning first to the argument regarding law of the case doctrine, that argument actually fails for two specific reasons. First, the District Court did not make any findings regarding Ms. Martin's physical functioning. So what's the—what do we take from that, though? I mean, of course, one possibility would be the District Court could go through the old RFC and just have a bullet list, you know, of all the things it had in it, and right at the end of it, this is being affirmed, this is being affirmed, this is being affirmed. But reading what happened before, it looks like the only problem the District Court has with it is the concentration, persistence, and pace. And the logical inference would be that there's nothing else reversible. Yes, Your Honor, I understand your question. I think what's important is that the District Court on remand specifically said that the RFC failed to accommodate Ms. Martin's mental impairments. And it also expressly said that it was declining to reach other arguments. So it did not put a stamp of approval, as you asked earlier, on the physical RFC. It simply just said it was not going to reach that issue. Well, the government was surely not arguing that the RFC was too generous to the plaintiff physically. No, Your Honor. And what's important to think about is that an RFC is a determination of the most that a claimant can do. So in this case, the original ALJ found that the most Ms. Martin could do was a sedentary job because she had severe physical limitations. Why isn't it error for the ALJ this time around, at a minimum, to explain this very counterintuitive jump from sedentary exertional criteria or ability all the way up to slogging around 100-pound pallets, to no exertional limitations? If you read the Social Security guidance, that's a lot of exertion, you know, it's a lot of weight. They're always talking about climbing ladders and hanging from the ceiling and moving around in giant amounts of weight and— Building skyscrapers. Building skyscrapers. Structural steel. Crawling under ladders, you know, stooping and swimming and, you know, everything else. So it doesn't make any sense to have the opinion devoid of explanation for why she suddenly has this vast range of exertional capability. Your Honor, I would—I guess I would challenge the idea that the ALJ's decision in the On exertion? I don't know. It's—let me find the opinion, probably easiest, to the ALJ, because the ALJ sets forth the RFC, it's over, like, one place at least, it's page 15 of 28 of the opinion. He actually says, the claimant had the physical residual functional capacity to perform a full range of work at all exertional levels. And there's not a word of explanation for why that—and so I'm not just inferring that he thinks that. He said that. Yes, Your Honor. And I think what I'm pointing to is that there's—it's not devoid of a discussion regarding Ms. Murphy. Exertion? Show me the discussion of why she has a full range of exertional levels. Your Honor, that—the discussion of Ms. Martin's physical functioning is under Step 2, where the ALJ discusses her severe impairments. So the ALJ discusses why he found that she no longer had any severe physical impairments. And within that discussion, he noted different physicians' opinions. He noted that there were state agency physicians who previously found that Ms. Martin was limited to light work, and he gave good reasons for discounting those opinions. So he relied on Dr. Oskonan, right? Dr. Oskonan, yes. So did Dr. Oskonan have Dr. Ringel's exam notes that he considered? Yes, Your Honor. He did? Yes, because Dr. Oskonan was the last state agency physician to submit an opinion in 2013. Did Dr. Oskonan note that as matters that he considered? I believe Dr. Oskonan's opinion was essentially just a form where he listed the fact that he did not believe Ms. Martin had physical impairments. He said he received evidence from her primary care exams and from the psychiatrist, but not from Dr. Ringel's. Dr. Ringel's is the one who examined her. The ALJ seems to have overlooked that fact and found very extensive limitations on range of motion, basically head to toe on her spine. Yes, Your Honor. The ALJ did not overlook Dr. Ringel's examination. The ALJ discussed it and gave reasons for discounting it. And those reasons included he did not assess a medical impairment, but only reiterated her complaints. That's incorrect, right? Because he examined her and he found these extensive limitations to her range of motion. I believe that he did not make a diagnosis. Does that matter? It is something that the ALJ can consider. And I think that went into the entire package of the entire record, I guess, where we can see that Ms. Martin was not seeking treatment for physical impairments. You're asking us to take, in essence, a lot on faith about how well this second examination or consideration of physical impairments went, and that it went from sedentary to very heavy. And what worries me is, I mean, I've been scouring this opinion sitting here, because I didn't remember any place where, I mean, sauce for the goose, sauce for the gander. I mean, it is quite easy to test somebody for their lifting ability. You know, you can document that. You can't just sort of eyeball somebody and say, oh, I think she can lift 100 pounds all the time, you know, or somebody else lifts 42-pound bags of kitty litter a lot, so she can do anything. You can just test. And why the commissioner should assume that because maybe her discs aren't compressed as badly as she thought they were, that she can do heavy exertional work, there's no link between those two observations. There's no discussion of why she can get above, to be precise for what Mr. Forbes was talking about, above the light exertional level. And that's a critical fact-finding. Yes, Your Honor. I think when we look at the ALJ's decision, we do see that the ALJ considered the entire record in proceeding. You're saying this, but I am looking for a page or a paragraph that you're relying on, because just obviously, as you know, it's the ALJ's assessment that we're reviewing. It's not counsel's position. Yes. So, where? Your Honor, under step two, where the ALJ... You're saying step two, and I'm flipping around, you know, page seven, page eight. Where in this opinion? We're talking about head shaking. We're talking about Asperger's. We're talking about... Yes.  Right. And that's what I just finished looking at, and I couldn't see anything about her ability to handle heavy weights, or to run, or to crawl underneath things, you know, all of these things that the Commissioner's regulations about the higher exertional levels make relevant. Your Honor, I think... I just don't see it. Now we've moved over to the psychiatrist, and the neurologist, and Dr. Ringel, and... I think what you see on those pages is examinations where Ms. Martin had a normal gait. We see the ALJ discussing the fact that she did not complain of neck or back pain. But people with normal gaits are sometimes limited to light exertional levels, because having the ability to walk normally doesn't necessarily mean that you can lift very heavy weights. Yes, Your Honor. I think another part of this issue is, as we discussed previously, was the fact that Ms. Martin was not alleging physical impairment in either application. And to go along with that... Can you explain that with the... I don't know. That is a complete mystery to me in the second application, after an ALJ has already found severe physical impairment, she files a new application and alleges no physical impairment. Your Honor, I can't explain her choice in her application, but I think it's good evidence, along with the rest of the record, in the fact that she wasn't seeking treatment for physical conditions, she wasn't complaining of pain, and she was primarily treating with over-the-counter medication. That's what happens to people who can't work, don't have insurance, can't pay for treatment, and they live in a way that won't aggravate the problems. Your Honor, that can be true, yes, but Ms. Martin was regularly seeking treatment for mental impairments. She was regularly seeking that treatment, but she wasn't seeking treatment for pain. So I think it is important to note that she didn't apply for disability benefits alleging that she was physically impaired. She also said that she did not stop working because of physical impairments, it was because of mental impairments. And Your Honor, to your earlier questions regarding the amount that someone can lift, in many of our Social Security cases, we might not have a test, we might not have a record that says that this person in front of me lifted 20 pounds. What we have is an entire record of several different treatment notes and examinations where physicians are making observations about how someone functions physically. And so we do consider things like gait, we consider the treatment that someone seeks, and in this case, I think the record supported the ALJ's decision not to include any physical limitations in the RFC. Okay. Well, I think that's it. Thank you. You've used up your time, so thank you very much. Thank you. Thanks as well to Mr. Forbes. We will take the case under advisement and the court will be in recess.